# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **HANNAH FRAZIER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-00563** |
| | ) | **Judge Aleta A. Trauger** |
| **BREVILLE USA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is the Motion to Exclude Plaintiff's Expert Jeffry D. Hyatt and for Summary Judgment (Doc. No. 49) filed by defendant Breville USA, Inc. ("Breville"). For the reasons set forth herein, the motion will be denied.

## I.    BACKGROUND

### A.    The Pressure Cooker

This is a product liability case involving a Breville BPR600XL pressure cooker (the "Pressure Cooker").[1] The Pressure Cooker is a stand-alone, electric pressure cooker that cannot be used on a stovetop or gas range. It was manufactured sometime between December 9, 2012 and December 17, 2012. It was given to plaintiff Hannah Frazier as a housewarming gift some time in 2018, but Frazier could not recall the full name of the person who gave it to her. Frazier testified that the person who gave it to her and her (now) husband was named Davin, that he worked with

---

[1] The facts set forth herein for which no citation is provided are undisputed, or undisputed for purposes of the Motion for Summary Judgment, and are drawn from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("Resp. SUMF") (Doc. No. 77-1). All stated facts are either undisputed for purposes of the summary judgment motion or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

her husband, and that Davin got the Pressure Cooker from his parents. (Doc. No. 79-3, Frazier Dep. 14–15.) She did not know when or where Davin or his parents purchased the Pressure Cooker. (*Id.* at 16.) She could not affirmatively say that it had not been opened before, who might have owned it before Davin or his parents, or whether any alterations had been made to it before she received it. (*Id.* at 16–17.) However, she testified that, when she received it, the Pressure Cooker appeared to be in its original box, and the box was taped closed and "did not look like it had been opened." (*Id.* at 16.) She testified that the Pressure Cooker had a dent on the back from something falling on it in the sink when she was washing it, but it was otherwise undamaged. (*Id.* at 20.)

Frazier alleges that, on June 5, 2022, she used the Pressure Cooker to prepare a pot roast. She explained that she "put it on pressure cook mode" and "let it cook." (*Id.* at 21.) Once it beeped, signaling that cooking was completed, she "let it natural release, as [she] would commonly do." (*Id.*) Normally, when she "let it natural release, you could turn the thing[2] and make sure no steam came out." (*Id.* at 22.) When she turned the lid to open it, "it turned easily" and then "exploded" (*id.*), spraying super-heated liquid and steam across her body. She went to the emergency room the night of the accident for treatment of the burns. She alleges that she suffered "permanent injuries to her abdomen" as a result of this incident. (Doc. No. 1, Compl. ¶ 18.)

### B.    This Lawsuit

Frazier filed suit against Breville on June 1, 2023, stating claims for strict liability, negligence, and breach of warranty. In support of her strict liability claim, Frazier asserts that the Pressure Cooker was designed, manufactured, marketed, imported, distributed, and sold by Breville in a defective condition that rendered the product unreasonably and foreseeably dangerous, because the lid could open while the contents were still under pressure and/or because

---

[2] The court presumes that by "thing" Frazier meant the pressure release valve.

the Pressure Cooker did not contain adequate warnings. In support of her negligence claim, she asserts that Breville breached its duty of care by designing, manufacturing, marketing, promoting, advertising, and/or selling the Pressure Cooker such that a defect existed, failing to adequately warn consumer of unreasonable dangers inherent in its design and manufacture, or failing to remedy, recall or otherwise warn consumers of the defective and dangerous condition. In support of her warranty claim, she asserts that Breville breached all applicable express warranties as well as the implied warranties of merchantability, usage of trade, and fitness for a particular purpose.

### C. The Plaintiff's Expert

The plaintiff retained Jeffrey D. Hyatt of Specialized Testing & Forensic Laboratory to inspect and test the Pressure Cooker and provide an expert report ("Hyatt Report" or "Report").[3] Hyatt inspected and tested the Pressure Cooker using the UL (for "Underwriters Laboratory") 136 "Standard for Pressure Cookers."[4]

Hyatt understood that the lid had opened when the contents were still under pressure. He had been told that Frazier, after allowing the Pressure Cooker to naturally release steam for several minutes, pressed the pressure release valve button to allow the Pressure Cooker to further vent. After several more minutes, she opened the lid. (Hyatt Report at 2.) "She felt no resistance as she twisted the lid open, and suddenly without warning, the lid flew off the cooker. The scalding contents erupted onto Ms. Frazier, burning her stomach." (*Id.*) Thus, the defect as alleged by the plaintiff relates to the locking mechanisms contained in the lid of the Pressure Cooker. The lid is designed to lock automatically when the Pressure Cooker is pressurized. As the Pressure Cooker's

---

[3] The Hyatt Report is in the record at Doc. No. 49-5 and Doc. No. 77-7.

[4] The plaintiff explains that UL Solutions is a "safety science organization that tests and certifies products to ensure they meet safety standards. These are voluntary standards, not required by any governmental agency." (Doc. No. 77 at 2.)

contents heat up and the Cooker begins to pressurize, a float valve is activated that engages the automatic locking pin in the lid.

Hyatt states that, when he received the Pressure Cooker, it did not have any evidence of physical damage. (*Id.* at 3.) He first inspected and measured it. He measured the Pressure Cooker's lid locking pin with the Pressure Cooker's lid off and not under pressure. In that state, he measured the lid locking pin to be .291 inches long in its uncompressed state and .168 inches in its fully compressed position. He did not measure the lid locking pin while the Pressure Cooker was under pressure.

Hyatt tested the Pressure Cooker "to determine its maximum working pressure parameters." (*Id.* at 6.) To do this, he half-filled the Pressure Cooker with water and placed an "electronic pressure measuring transducer" in the water. (*Id.*) He closed the lid, set the control to high pressure, and turned it on, setting it to a sixteen-minute pressure cycle. (*Id.*) He observed that the float valve lock rose and locked automatically as the unit heated and the pressure increased. He also noted that the maximum temperature reached was 224 degrees Fahrenheit and the maximum pressure achieved was 4.96 psig.[5] (*Id.* at 8; *id.* Fig. 13.[6])

Hyatt then tested the locking mechanism on the Pressure Cooker, using UL 136 as a guideline. He states in his Report that the intent of the UL 136 standard "is to provide a minimum

---

[5] Frazier testified that "psig" means "pounds per square inch gauge," referring to "gauge pressure." (Doc. No. 77-3, Hyatt Dep. 58.)

[6] The defendant takes issue with Figure 13 in Hyatt's Report—and with the data reported therein—because Figure 13 appears to show that the pressure inside the Pressure Cooker started below zero and remained below zero until the water temperature went above 150 degrees, before eventually reaching a maximum of almost 5 psig. (*See* Report at 8, Fig. 13.) Hyatt explained in his deposition that, when he created the graph, he had "set the offset for atmospheric pressure at 14.7," when the actual offset should have been 14.2, and, when he "made that correction, then it . . . shifts the graph to 0, where it should be." (Hyatt Dep. 53.) Hyatt did not explain whether that meant that the calculation of the maximum internal pressure should also have been modified by .5 above what the graph shows, for an actual maximum of 5.46 psig.

test requirement that a pressure cooker while pressurized sufficiently to present a hazard of ejecting steam or liquid that can burn, shall be locked in such a way that 100 lbs. of force rotating the lid shall not cause it to open." (*Id.* at 8.) To test whether the lid conformed to this standard, Hyatt placed the Pressure Cooker in a "specially prepared test stand," filled it to its "high-level limit line with water," placed the lid and a pressure gauge on the Pressure Cooker, and secured a nylon cord around the lid circumference, which was "used to apply turning/opening load to the lid" once the desired level of pressure was reached. (*Id.* at 9.)

For this part of the test, Hyatt does not state the pressure setting to which he set the Pressure Cooker, for how long, or how long the test lasted. However, his Report states that, "[a]s the water began to boil the action of the float valve on the automatic locking pin was observed," and he "noted that the float valve activated the lock at a pressure less than 0.25 psig." (*Id.* at 10.) Hyatt explained:

> When the internal pressure of the Pressure Cooker reached 2 psig. the power was turned off and a turning/opening load was applied to this lid through pulling on the cord attached around the lid. The force applied to the cord was recorded by using an electronic force gauge. This pulling force was applied tangentially to the lid in accordance with the requirements of UL136. The pulling force was incrementally increased until the lid rotated and came off. The force required to turn the lid was recorded as 26.3 lbf.[7]

(*Id.*) Page 12 of his Report shows a "picture of the lid coming off" and the "contents . . . being ejected by the pressure in the . . . vessel," "which was 2 psig." (Hyatt Dep. 65.)

Hyatt testified that he selected 2 psig because, in his experience, that amount of pressure is sufficient to fully pressurize the cooker and activate the lid lock, but not sufficient to completely prevent turning the lid. "So it's a great test of the lid lock at a pressure where . . . if the lid lock doesn't function, it's likely to open." (*Id.* at 59.) At higher pressures, "you're approaching physical

---

[7] Frazier testified that "lbf" means "pounds-force." (Doc. No. 77-3, Hyatt Dep. 65.)

impossibility to get it to open," because the "friction on those locking lugs increases" due to the internal pressure. (*Id.*) He agreed that the full test prescribed by UL 136 calls for raising the internal temperature and pressure of the cooker to the maximum,[8] applying 100 pounds of pressure to the lid, and then "slowly reduc[ing] the pressure until the pressure allows the lid to open or not." (*Id.* at 60.) Rather than raising the temperature and pressure to the maximum in his test, he "cut out the middleman and tested [the Pressure Cooker] at 2 psi, because, normally, at 3 and 4 . . . and 5, you're probably not going to get it to open." (*Id.*) He explained that, "[i]f the lock is working, . . . it's going to stay locked," and the amount of force applied to the lid at any amount of pressure would not matter, but with less pressure, "the friction forces are not playing as significant a role in keeping that lid from turning, as [they] would at higher pressure." (*Id.* at 61.) Moreover, "under all the practices in the industry, the UL 136, that lid shouldn't open if the contents are pressurized and hot enough to cause liquid . . . to be ejected." (Hyatt Dep. 66.)[9]

Hyatt concluded that a manufacturing defect exists related to the Pressure Cooker's lid lock pin. As he explained when deposed, "my experience tells me that this pin doesn't stick out far enough when it's locked and that allows the lid to slip open. The pin doesn't fail, it simply slips by. . . . [T]he pin is not broken, the pin is not damaged. It just doesn't stick out far enough" to prevent the lid from being opened while the contents of the pot are still under pressure. (*Id.* at 44.) He testified that he has tested somewhere between thirty and fifty pressure cookers and that the Pressure Cooker at issue here opened more easily, with less force, at 2 psig than any of the other

---

[8] One of Breville's arguments is that Hyatt did not heat the Pressure Cooker to maximum pressure before conducting the cover test. But UL 136 actually states that, "[i]f the pressure cooker is provided with a mechanical locking device (e.g. a locking pin) that prevents the opening of the cover under pressure, then the source of heat may be turned off as soon as the activation of the locking device can be detected." (Doc. No. 77-2, UL 136 ¶ 9.5.)

[9] He also testified that, below 1 psig, "you're really not going to have a meaningful ejection." (Hyatt Dep. 68.)

cookers he has tested, and it has one of the least robust locking mechanisms that he has tested. (*Id.* at 90, 92.)

UL 136 states that its requirements "cover household-type cooking utensils known as pressure cookers or pressure sauce pans which operate at a nominal pressure of 15 psig (103kPa) or less. They are intended for use over gas- or electric-top burners of residential-type cooking ranges." (*See* Doc. No. 77-2, UL 136 at 8.) Hyatt's Report states that UL 136 is "the appropriate standard for this [Pressure Cooker], and it represents what the pressure cooker industry minimum practices require for lid safety and locking. (Hyatt Report 15.) In his deposition, he further noted that no other industry standard provides "standards that test for the securement of the cover . . . for a pressure cooker." (Hyatt Dep. 88.) Thus, "if a manufacturer decided that it was not going to test for UL 136," there would be no other "industry standard that prevent[s] a risk of burn from a cover coming off a pressure cooker." (*Id.*)

A sticker attached to the Pressure Cooker itself states that it conforms to UL 1026 and UL 1083. (Hyatt Report 4.) It does not reference UL 136, and the Report does not mention or refer to these other standards. However, Hyatt testified that the only difference between electric pressure cookers and stovetop pressure cookers is that one has a heating source and one does not, and they all have the same "pressure-activated lid locking system" that the Breville Pressure Cooker has. (Hyatt Dep. 18–19; *see also id.* at 21 ("[T]he pressure retention components, they work the same.").) He also stated that,"[w]hether it's an electric pressure cooker or a stovetop pressure cooker, they all have the same safety and regard to safety for the lid retention system and the pressure lock, which is consistent with UL 136." (*Id.* at 19–20.) When asked whether stovetop pressure cookers can reach higher internal temperature and pressure, he said they do not: "No. The deadweight pressure regulator sets the system pressure and that's the same on the stovetop as the

countertop electric pressure cookers." (*Id.* at 22.) He also noted that no electric pressure cooker of which he was aware indicates that it was tested for conformance with UL 136, even if the manufacturers do in fact test in conformance with UL 136. (*Id.* at 69.)

Hyatt also explained why he filled the Pressure Cooker to the full level when testing the lid lock mechanism, even though UL 136 specifies to fill the cooker being tested to half-full: "The pressure is the same. . . . [B]ut the problem is, people don't use them half full. So I want to know what it looks like when it's running at the maximum manufacturer's fill point." (*Id.* at 72.) In other words, he intentionally deviated from the UL 136 testing procedure, because he "want[ed] to know how much liquid it could eject if that lid came off with it full." (*Id.*)

Based on his inspection and testing, Hyatt made the following findings relating to the Pressure Cooker:

- The subject cooker did not have any evidence of any mechanical damage, and the lid closed normally.

- I have assumed for this report that Beville made a manufacturing error in the construction of the subject pressure cooker and that they intended to use the entire .291" of available lock pin extension to lock the lid. However, they only used 0.168". I reserve the right to amend this comment should discovery documents produced in this matter indicate that they only intended to use the 0.168" extension.

- To date I have not seen any documentation that would eliminate this from being a design defect.[10]

---

[10] Hyatt explained during his deposition the difference between a design defect and a manufacturing defect:

[A] design defect would indicate that the product conformed with its design intent and its design specifications, and the defect persisted due to an error in design.

A manufacturing defect means that the product didn't conform to the manufacturers design intent or it had a part deviation [with] respect to what the manufacturer intended. And, therefore, it didn't conform to its design intent.

(Hyatt Dep. 29.) In this case, he assumed that the length of the locking pin when fully compressed was a manufacturing defect—that it was shorter than the intended design—because he lacks

- The heating and control system of the pressure cooker operated normally.

- The pressure cooker ejected just over 1/3 of its contents (5 of 13 cups) during the lid opening test at 2 psi.

- UL136 is the appropriate standard for this pressure cooker, and it represents what the pressure cooker industry minimum practices require for lid safety and locking.

- The evidence indicates that Breville intended to meet the automatic locking requirements of UL136.

- The pressure cooker's float valve and lid lock were properly activated by pressure at the beginning of the pressure-cooking cycle.

- In spite of the lid being locked, the lid could be opened while the cooker was pressurized to 2 psig. with only 26.3 lb. of force applied in a manner consistent with UL136.

- The UL 136 lid lock test requires that the pressure cooker lid not open before the opening force reaches 100 lbf. when the pressure cooker is pressurized. The subject pressure cooker failed to meet the requirements of UL 136 for pressure cookers.

- I have also tested alternative designs that would have prevented the explosion that occurred in this matter.

(Hyatt Report 14–15.)

Based on this data, Hyatt reached the following opinions "to a reasonable degree of scientific certainty":

1. The pressure activated lid lock is intended to prevent the lid from being opened once the pressure cooker was pressurized above 0.25 psi.

2. The lid lock engagement was insufficient, as it was manufactured, to prevent the opening of the lid while the pressure cooker is pressurized.

---

sufficient information to presume that Breville intended it to be that short. (*Id.* at 30.) But he reserved the right to change his opinion in the event that "it turns out through testimony from Breville and their design people and their drawings that this product does, in fact, exactly and precisely conform to their design intent." (*Id.*) In that event, he would "change that statement from a manufacturing defect for this one pressure cooker to . . . a common defect in all of their pressure cookers based on their design." (*Id.*)

3. The manufacturing defect in the lid lock made this Breville electric pressure cooker defective and unreasonably dangerous.

(*Id.* at 15.)

## II.     THE DEFENDANT'S MOTION

The defendant argues, first, that Hyatt's testimony and opinions must be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) because (1) his opinions are not the product of reliable principles and methods; (2) he did not reliably apply those principles and methods to the facts of this case; (3) the opinions are not based on sufficient facts or data; and (4) his opinions will not assist the jury to understand the evidence or determine a fact at issue. (Doc. No. 49-1 at 9–17.) Second, Breville asserts that, once Hyatt's opinions are excluded, it will be entitled to summary judgment because, without expert testimony, the plaintiff cannot carry her burden of establishing that the Pressure Cooker was defective or unreasonably dangerous at the time it left the control of the manufacturer or seller. (*Id.* at 19.)

Third, Breville argues that the plaintiff, with or without expert testimony, cannot establish that the Pressure Cooker was in a defective condition at the time it left the control of the manufacturer or seller because, by her own admission, she does not know who owned the Pressure Cooker before it was given to her and does not know whether any alterations had been made to it before it was given to her. (*Id.*) In addition, Breville argues, Hyatt had no ability to state whether the Pressure Cooker was defective or dangerous when it left Breville's control, did not know whether it had undergone alterations prior to coming into the plaintiff's possession, and did not inspect or test another exemplar unit to see whether it was different from the plaintiff's Pressure Cooker. (*Id.* at 19–20.)

Finally, Breville asserts that Frazier's claims are barred by the ten-year statute of repose, because the plaintiff has not satisfied her burden of proving that the Pressure Cooker was first sold sometime after June 1, 2013. (*Id.* at 20–21.)

The plaintiff has filed a Response in opposition to Breville's motion, countering each of its arguments. (Doc. No. 77.) She maintains that Hyatt's opinions and testimony should not be excluded but that, even if they are, genuine disputes of material fact preclude summary judgment.

Breville has filed a Reply. (Doc. No. 80.) Aside from reprising the arguments made in its Memorandum, it objects to the plaintiff's reliance on an August 27, 2024 letter to Michael Niedermayer of UL Standards and Engagement from the U.S. Consumer Product Safety Commission. As the defendant points out, this letter post-dates the plaintiff's accident by two years and post-dates the manufacture of the Pressure Cooker by twelve years. It makes recommendations to UL that apparently have not been followed, and it refers to UL standards that are not in the record—and that have apparently only been proposed, not adopted. (*See* Doc. No. 77 at 2–3.) The court agrees that this document is irrelevant and has not taken it into consideration in addressing the defendant's motion.[11]

## III.     LEGAL STANDARDS

### A.     Federal Rule of Evidence 702

Rule 702 governs the admissibility of expert testimony. It states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[11] The defendant further objects that the letter is not authenticated and that the plaintiff has not established that it can be presented in admissible form at trial. (Doc. No. 70 at 2 (citing Fed. R. Civ. P. 56(c)(2)).)

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Thus, aside from establishing a witness's qualifications as an expert, the proponent of expert testimony must persuade the court by a preponderance of the evidence that the expert's testimony is both relevant and reliable. *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017) (citing *Daubert*, 509 U.S. at 589).

Notably, Rule 702 was amended in 2023 to emphasize that the *court* is entrusted with determining whether the admissibility criteria have been established, rather than treating them as "questions of weight" to be determined by the factfinder. Fed. R. Evid. 702 advisory committee's notes to 2023 amendment; *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."). However, "nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The Rule 104(a) standard does not require perfection." Fed. R. Evid. 702 advisory committee's notes to 2023 amendment. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008)).

**B.      Federal Rule of Civil Procedure 56**

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P.

56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018). By its terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 248 (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence" that the nonmoving party is entitled to a verdict. *Id.*

## IV.     DISCUSSION

### A.     The Motion to Exclude

Breville does not challenge Jeffrey Hyatt's qualifications as an expert; instead, it challenges the reliability of his principles and methodology. Specifically, it asserts that (1) Hyatt must be excluded from testifying because "the principles and methodology he employed were based entirely on UL 136," but he failed to establish that UL 136 even applies or should apply to electrical pressure cookers, as opposed to stovetop pressure cookers (Doc. No. 49-1 at 10; (2) even assuming UL 136 applies, Hyatt did not apply the prescribed testing methodology set out in UL 136; (3) "even using the wrong standard and applying that standard's principles and methodology incorrectly, Mr. Hyatt demonstrated that the Pressure Cooker required more force to open than can be exerted by an average male or female" (*id.* at 12–13); (4) Hyatt's Report "acknowledges that the lid locking mechanism used in the Pressure Cooker would only activate while under pressure, yet he fail[ed] to measure or observe the lid locking pin as it was engaged under pressure," making his conclusions "based on insufficient data; specifically, how much of the lid locking pin would engage under pressure" (*id.* at 14); (5) the data chart in Hyatt's Report shows that the internal pressure of the Pressure Cooker was negative for the majority of the test, and he "fails to account for any condition that would make the internal pressure of the cooker less than zero for the majority of the test," thus making the "data he offers in the chart . . . unreliable and insufficient" (*id.* at 15); (6) Hyatt's conclusion that Breville intended for the Pressure Cooker to "meet the automatic locking requirements of UL 136" is not supported by sufficient evidence, given that the Pressure Cooker itself states that it was intended to comply with US 1026 and UL 1083 (*id.* at 15); and (7) for all of these reasons, Hyatt's testimony would not assist the jury in understanding the evidence or determining a fact at issue in this case. In this section, Breville also argues that Hyatt's description of the incident is inconsistent with the plaintiff's testimony, insofar as he understood

that she "felt no resistance as she twisted the lid open" (Hyatt Report at 2), whereas the plaintiff actually testified that the lid turned "easily" (Frazier Dep. 22). Breville contends that Hyatt's hypothesis—that the lid opened without resistance—contradicts his finding that it took 26.3 pounds of force to open while under pressure and that Hyatt "fails to explain how his conclusion that the Pressure Cooker required 26.3 pounds of force to open while under pressure has any bearing on whether a defect caused Plaintiff to be able to open the Pressure Cooker lid 'easily' and 'with no resistance' as she has testified to." (Doc. No. 49-1 at 17.)

The court, in short, is not persuaded that Hyatt's testimony should be excluded as unreliable.

### 1. UL 136

Based on its own expert's opinion, Breville contends that Hyatt's testimony must be excluded in its entirety because Hyatt failed to establish that UL 136 applies or should apply to electrical pressure cookers, as opposed to stovetop pressure cookers (Doc. No. 49-1 at 10.)

However, Hyatt states in his Report that UL 136 is "the appropriate standard for this [Pressure Cooker], and it represents what the pressure cooker industry minimum practices require for lid safety and locking." (Report 15.) He reiterated as much in his deposition and further testified that no other industry standard provides standards that test for the securement of pressure cooker lids. (Hyatt Dep. 88.) He explained that there are no real differences between stovetop cookers and electric cookers aside from the source of heat and that they all have basically the same "pressure-activated lid locking system" that the Breville Pressure Cooker has. (*Id.* at 18–19; *see also id.* at 21.)

Hyatt's testimony is sufficient to create, at a minimum, a question of fact as to whether it is appropriate to apply UL 136 standards to electric pressure cookers. That UL 136, on its face, states that it applies to stovetop cookers is a matter that Breville remains free to cross-examine

Hyatt about in order to challenge his credibility, and the defendant's challenge goes to the weight rather than the admissibility of his opinions.

### 2. The Prescribed Testing Methodology

Breville next argues that, even assuming UL 136 applies, Hyatt did not utilize the prescribed testing methodology set out in UL 136. Hyatt, however, acknowledged as much during his deposition and explained why he intentionally chose not to follow precisely some of the procedures recommended in UL 136. This was not oversight on his part. Again, Breville's challenge goes to the weight of Hyatt's testimony, rather than its admissibility.

### 3. Torque vs. Pounds Force

Next, Breville contends that, "even using the wrong standard and applying that standard's principles and methodology incorrectly, Mr. Hyatt demonstrated that the Pressure Cooker required more force to open than can be exerted by an average male or female" (Doc. No. 49-1 at 12–13.) According to Breville's expert, the 26.3 pounds of force measured by Hyatt is equivalent to 131.5 "inch-pounds of torque, which is well in excess of what an average [person] has been observed to exert." (Doc. No. 49-1 at 13 (citing Doc. No. 49-6, Leffler Report ¶ 7(c)).) But Leffler's opinion is simply Leffler's opinion, which is contrary to Hyatt's. It does not provide a basis for excluding Hyatt's opinion. Notably, moreover, UL 136 prescribes the method for testing the force necessary to open a pressurized lid, and it speaks in terms of pounds of force, not torque. (See Doc. No. 77-2, UL 136 ¶ 9.6.)[12]

### 4. The Measurement of the Locking Pin

Breville takes issue with Hyatt's purported failure to measure the lid locking pin while it was under pressure. Hyatt testified, in response to Breville's expert's critique of his opinion, that

---

[12] The UL also refers to force interns of the newton (symbol N). (See UL § 9.)

"the pin engagement when the lid is installed is not readily measurable because the pin is under cover. . . . You can't measure the pin while the lid is installed. You've got to measure the pin while it's uninstalled, unless you want to cut a hole in the lid." (Hyatt Dep. 35.) Hyatt's Report states that the measurement recorded while the lock pin was engaging the float valve lock represented the "fully locked position it would have been in while pressurized." (Report 6.) Nothing in Leffler's Report suggests that the pin would have extended further while under pressure. This objection does not provide a basis for excluding Hyatt's testimony.

Breville also contends that "Hyatt does not provide any support for his claim that Breville intended to use all .291 [inches] of the lid locking pin while under pressure" or "include any facts or data to support his conclusion that the Pressure Cooker was designed to use the entire .291 [inches] of the lid locking pin." (Doc. No. 49-1 at 15.) Hyatt, however, explained that he made that assumption because he was not in possession of actual design documents from Breville to show what its intended design was, and he reserved the right to change his opinion if documents produced by Breville showed that, in fact, the manufacturer intended for the compressed pin to extend only .168 inches. In that event, Hyatt would modify his opinion to state that the compressed length of the locking pin was a design defect rather than a manufacturing defect that affected only the plaintiff's Pressure Cooker. Hyatt's opinion, in any event, is that the length of the pin in the case of this particular pot was insufficient to prevent it from opening under pressure:

> [I]t's obvious to me that Breville intended for that lid to be locked, safe and secure, above 0.25 psi. So we know the lock is supposed to come up and lock it and it should be locked and secure. . . .
>
> Obviously, it . . . does come off. And like I said earlier, I think the pin engagement length is the biggest factor in that. So, right now, I'm making the assumption that this is a one off, that this one is unique. I haven't tested the others, so this one is unique. And without more data, I can't analyze whether this one is truly unique or if all of them are this way. If they're all this way, then it's likely design defect.

(*Id.* at 66–67.) Breville's objections do not make his opinion unreliable or inadmissible.

5.      *The Reliability of the Data in Figure 13*

Breville points out an error on a data chart in Hyatt's Report purporting to show that the internal pressure of the Pressure Cooker was negative for the majority of the test. It asserts that Hyatt "fails to account for any condition that would make the internal pressure of the cooker less than zero for the majority of the test," thus making the "data he offers in the chart . . . unreliable and insufficient." (Doc. No. 49-1 at 15.) As set forth above, Hyatt does explain this discrepancy in his deposition and accounted for it. It appears that the only difference this error would have made would be to shift the maximum internal pressure of the Pressure Cooker by .5 psig, but it does not appear to have had any effect on Hyatt's other calculations. While this error might detract from Hyatt's credibility before the jury, it does not make his opinions unreliable or inadmissible.

6.      *Breville's Intentions*

Finally, Breville takes issue with Hyatt's finding that Breville intended for the Pressure Cooker to "meet the automatic locking requirements of UL 136" on the basis that this finding is not supported by sufficient evidence, given that the Pressure Cooker itself states that it was intended to comply with US 1026 and UL 1083. (Doc. No. 49-1 at 15 (quoting Hyatt Report at 15).)

Hyatt made it clear in his deposition that UL 136 is *the* locking mechanism standard and that the "industry requires" any pressure cooker lid to remain locked while the contents are under sufficient pressure that liquid could be ejected if it were opened. (Hyatt Dep. 69.) The fact that the Pressure Cooker here has a locking mechanism that engaged below 0.25 psig of pressure indicated to him that Breville intended to comply with industry safety standards, irrespective of whether it identified UL 136 on the Pressure Cooker's label. In other words, according to Hyatt, the design of Breville's locking mechanism itself demonstrated Breville's intent that its pressure cookers be safe and in compliance with industry standard. He noted that, to his knowledge, none of the electric

pressure cooker manufacturers identify UL 136 on their products, but they basically all employ locking mechanisms that indicate their intent to comply with the industry standard. (*Id.*) "And under all the practices in the industry, the UL 136, that lid shouldn't open if the contents are pressurized and hot enough to cause liquid to be . . . ejected." (*Id.* at 66.) He later reiterated: "What I'm telling you, though, is everybody is doing this automatic lid locking device to prevent accidental ejection of hot liquid . . . once it's pressurized. That's what everybody's doing." (*Id.* at 70.)

Breville is free to take issue with this contention at trial, though it remains unclear to the court why it would want to. As the plaintiff points out, "Breville's criticism of Hyatt's findings merely amount[s] to an admission that it does not test its products to comply with UL 136." (Doc. No. 77 at 4.)

7.     <em>Whether Hyatt's Testimony Will Assist the Jury</em>

Breville asserts that, for all of the reasons addressed above, Hyatt's testimony would not assist the jury in understanding the evidence or determining a fact at issue in this case. The court finds, as set forth above, that Breville's arguments are more properly directed to the weight to be accorded Hyatt's testimony by the jury rather than to its admissibility. Breville has not shown that Hyatt's opinions rest on an unreliable foundation or unsupported speculation.

In this section, Breville also argues that Hyatt's description of the incident is inconsistent with the plaintiff's testimony, insofar as Hyatt understood that Frazier "felt no resistance as she twisted the lid open" (Hyatt Report at 2), whereas the plaintiff actually testified that the lid turned "easily" (Frazier Dep. 22). Breville contends that Hyatt's hypothesis—that the lid opened without resistance—contradicts his finding that it took 26.3 pounds of force to open while under pressure and that Hyatt "fails to explain how his conclusion that the Pressure Cooker required 26.3 pounds of force to open while under pressure has any bearing on whether a defect caused Plaintiff to be

able to open the Pressure Cooker lid 'easily' and 'with no resistance' as she has testified to." (Doc. No. 49-1 at 17.)

But Hyatt addressed this purported inconsistency in his deposition as well. He testified that consumers whose pressure cookers he has tested frequently describe the lid as opening "with "no resistance" or as being "easy to open," and he did not understand Frazier to mean literally that the lid had no resistance when she opened it. (Hyatt Dep. 90–91.) He explained that any pressurized vessel will have "drag" and offer "some resistance," even if the consumer perceives it as opening easily. (*Id.* at 91.)

### 8. *Conclusion: Daubert Motion*

The court finds that Hyatt's opinions are based on sufficient facts and data, are the product of reliable principles and methods, and reflect a reliable application of the principles and methods to the facts of this case. Fed. R. Evid. 702. Breville's motion will be denied, insofar as it seeks the exclusion of Hyatt's testimony.

### B. The Motion for Summary Judgment

Breville's first argument in support of the summary judgment portion of its motion is that, without expert testimony, Frazier cannot prove her case at all, so it is entitled to summary judgment. Having declined to exclude Hyatt's testimony, the court also rejects this argument and finds no need to address the plaintiff's contention that she can prove her case without expert testimony using the consumer expectation test.

Breville also argues that, with or without expert testimony, Frazier cannot establish that the Pressure Cooker was in a defective condition at the time it left the control of the manufacturer or seller because, by her own admission, Frazier does not know who owned the Pressure Cooker before it was given to her and does not know whether any alterations had been made to it before it was given to her. Breville adds that Hyatt has no ability to state whether the Pressure Cooker was

defective or dangerous when it left Breville's control, does not know whether it had undergone alterations prior to coming into the plaintiff's possession, and did not inspect or test another exemplar unit to see whether it was different from the plaintiff's Pressure Cooker.

These are matters that the plaintiff and her expert can be cross-examined about. The plaintiff testified that she received the Pressure Cooker in what appeared to be its original packaging, that the box did not appear to have been opened, and that it came with all its accessories and the owner's manual. (Frazier Dep. 16–17.) Hyatt stated in his Report that the Pressure Cooker had no evidence of physical damage (Report at 3), and he testified more specifically that he did not find any issues with the Pressure Cooker, such as wear and tear, "that would've affected the locking mechanism or the ability for it to stay locked." (Hyatt Dep. 89; *see id.* ("Everything . . . relevant . . . to the lock and the lock system and the lid securement appeared in good condition, as it would've come from the manufacturer.").) This testimony is sufficient to permit the jury to believe that the Pressure Cooker had not been altered and was in the same condition when given to Frazier as it was when it left the manufacturer, precluding summary judgment.

### C. The Statute of Repose

Finally, Breville argues that it is entitled to summary judgment based on the statute of repose. In Tennessee, any product liability action against a manufacturer or seller of a product must be brought within ten years "from the date on which the product was first purchased for use or consumption." Tenn. Code Ann. § 29-28-103(a). The statute of repose, a form of statute of limitations, is an affirmative defense. *Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 739 (Tenn. 2013); *Parton v. Johnson & Johnson*, 821 F. App'x 601, 603 (6th Cir. 2020)). As with any affirmative defense, the defendant bears the burden of pleading and proving it. *Lavery v. Pursuant Health, Inc.*, 126 F.4th 1170, 1175 (6th Cir. 2025) (citing *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008)).

In support of its argument that summary judgment is warranted based on the expiration of the statute of repose, Breville asserts: "When a plaintiff attempts to avoid a defendant's assertion of the statute of repose but cannot prove the purchase date of the product, the plaintiff bears the burden to show that the statute of repose does not apply." (Doc. No. 49-1 at 20 (citing *Electric Power Bd. v. Westinghouse Elec. Corp.*, 716 F. Supp. 1069 (E.D. Tenn. 1988), *aff'd sub nom. Elec. Power Bd. v. Monsanto Co.*, 879 F.2d 1368 (6th Cir. 1989)).) The cited case indeed, while denying summary judgment, noted that "the plaintiff will have the burden of proof at trial to show that neither the four-year statute of limitations nor the statute of repose bars its property damage and warranty claims against Universal, since it seeks to avoid the defendants' assertion of the affirmative defense." *Elec. Power Bd.*, 716 F. Supp. at 1077. Insofar as the court placed on the plaintiff the burden of avoiding an affirmative defense, simply because the defendant raised it but without presenting affirmative proof of when the motor at issue was purchased, it appears to have misstated the law. Moreover, the cases on which it relied do not support it. In *Akron Presform Mold Co. v. McNeil Corp.*, the undisputed facts established that the limitations period had expired by the time the plaintiff filed suit, but the plaintiff sought to avoid the application of the statute of limitations. *Akron Presform*, 496 F.2d 230, 233 (6th Cir. 1974). The Sixth Circuit identified two means by which a litigant can show that the statute of limitations should be tolled or suspended, *including* when (1) damages caused by the defendant's conduct remained "speculative, uncertain or otherwise incapable of proof" during the limitations period and (2) because of fraudulent concealment by the defendant. *Id.* The court held that, "[s]ince the[se] rules are in avoidance of the statute of limitations, the party seeking the benefit of them has the burden of proof to establish them." *Id.*; *accord, e.g.*, *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) ("'Because the statute of limitations is an affirmative defense, the burden is on the defendant to

show that the statute of limitations has run,' and '[i]f the defendant meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations.'" (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)). The court did *not* hold that the plaintiff has the burden of establishing the affirmative defense; rather the plaintiff has the burden of proving an exception applies once the defendant proves that the defense would otherwise bar the claim.[13]

Moreover, Tennessee law similarly recognizes that "the doctrines of equitable estoppel and fraudulent concealment [may] toll the running of the statute of limitations" in civil cases. *Redwing v. Cath. Bishop*, 363 S.W.3d 436, 460 (Tenn. 2012). The plaintiff, as the party invoking these doctrines, bears the burden of proof. *Id.* at 460, 462. But she incurs the burden, however, only if the "defendant has made out a *prima facie* statute of limitations defense." *Id.* at 460.

In this case, the defendant has established that the Pressure Cooker was manufactured sometime between December 9, 2012 and December 17, 2012. It was given to the plaintiff sometime in 2018. The incident giving rise to this lawsuit took place on June 5, 2022, and Frazier filed suit on June 1, 2023. To establish that her claims are barred by the statute of repose, *Breville* has the burden of proving that the Pressure Cooker was initially purchased prior to June 1, 2013— that is, more than ten years before this lawsuit was filed. Thus far, Breville offers nothing but speculation to suggest that Pressure Cooker was purchased between December 2012 and June 2013. Because it has not established a *prima facie* statute of repose defense, the burden does not

---

[13] Similarly, in the other case cited in *Electric Power Board*, the date of purchase of the warrantied items was stipulated; it was undisputed that the plaintiff had filed suit for breach of warranty outside the limitations period; and the plaintiff failed to allege facts showing that an exception applied. *McFarland v. Athletic House Marine, Inc.*, 489 F. Supp. 53, 53–54 (E.D. Tenn. 1980).

shift to the plaintiff to show that some exception applies. Breville is not entitled to summary judgment based on the statute of repose.

**V.      CONCLUSION**

For the reasons set forth herein, Breville's motion (Doc. No. 49) will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge